# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN SECTION OF TENNESSEE AT KNOXVILLE

TENNESSEE WELLNESS, INC.,

    Plaintiff,

v.

HOWARD G. HOLMES, MD,

INTERNAL MEDICINE, PLLC,

HOWARD G. HOLMES, MD,

MELISSA HOLMES a/k/a

GEORGIE HOLMES, and JOHN SANABRIA, both *jointly and severally*,

    Defendants.

Civil Action No.:_____

JURY DEMANDED

___

## COMPLAINT
___

Plaintiff, by and through under-signed counsel, hereby submits to this Honorable Court its complaint for damages against the Defendants as follows:

### PARTIES

1. Plaintiff, Tennessee Wellness, Inc., is a Wyoming Corporation with its principal place of business located in Sheridan, Wyoming.

2. Defendant, Howard G. Holmes, MD, Internal Medicine, PLLC, ("The Medical Practice") is a professional limited liability company with its principal place of business located at 460 Medical Park Drive, Suite 102, Lenoir City, TN 37772.

3. Defendant, Howard G, Holmes, MD, ("Dr. Holmes") is a citizen of Tennessee and a resident of Lenoir City, Tennessee.

1

4. Defendant, Melissa Holmes, ("Mrs. Holmes") is the wife of Defendant, Dr. Holmes, and is a citizen of Tennessee and a resident of Lenoir City and is also known as Georgie Holmes.

5. Defendant, John Sanabria, ("Dr. Sanabria") is upon information and belief a citizen of Tennessee and a resident of Loudon County, Tennessee.

## VENUE AND JURISDICTION

6. Jurisdiction and venue are proper before this Court. The parties to this action are completely diverse. See 28 USC § 1332. In addition, venue is proper before this Court as the operative facts giving rise to this lawsuit took place in Loudon County, Tennessee. See 28 USC § 1391(b)(1).

## FACTS GIVING RISE TO CAUSE OF ACTION

7. On or about March 3, 2019, Wendy Rose, CEO and owner of Plaintiff (herein referred as "Rose"), met Dr. Holmes and Mrs. Holmes (herein collectively referred as "The Holmes"), at Aubrey's Restaurant in Lenoir City to discuss Dr. Holmes being the medical director for a weight loss and wellness clinic that was going to be located in Farragut. Also, in attendance at the meeting were Richard Lehner, Rodrigo Paredes and Bert Underwood (herein referred as "Underwood").

8. On March 29, 2019, The Holmes suggested that the weight loss and wellness clinic should be run out of Dr. Holmes' medical office in Lenoir City, Tennessee, rather than renting a separate office in Farragut, Tennessee which the Plaintiff was considering. Underwood was present for this discussion. At all relevant times hereto, Dr. Holmes cloaked Mrs. Holmes with apparent authority for all decision making regarding The Medical Practice except for medical decisions.

9. In April of 2019, while the weight loss and wellness clinic was being set up, The Holmes also suggested that Plaintiff manage and purchase Dr. Holmes' Medical Practice along with adding the weight loss and wellness clinic to the existing internal medicine services.

10. Plaintiff entered into an oral agreement, which was thereafter reduced to writing (herein referred to as "The Agreement"), with The Medical Practice and The Holmes, under the terms of which Plaintiff would purchase the Practice, Plaintiff would retain Dr. Holmes as the medical director of the weight loss and wellness clinic within his practice as well as all future weight loss and wellness clinics opened within Tennessee, and Dr. Holmes would be paid pursuant to the terms agreed to in The Agreement, which is attached hereto as Exhibit A.

11. The Holmes orally agreed to all the terms of The Agreement and began to act in accordance with the terms of The Agreement, which is contained in Exhibit A,

12. After the Plaintiff, The Medical Practice and The Holmes agreed to the terms of The Agreement, Mrs. Holmes sent text messages to Rose verifying The Holmes' consent to The Agreement. On March 6, 2019, Mrs. Holmes requested $4,500 from Plaintiff to pay the bills for the Practice recognizing that Plaintiff controlled the finances of the Practice, which was paid to various creditors of the Defendant. On May 8, 2019, Mrs. Holmes verified The Medical Practice by Dr. Holmes' and The Holmes' consent to The Agreement, as well as their intent to "move forward" with the terms of The Agreement. See Exhibit B.

13. The Medical Practice was functionally deficient when the parties entered into The Agreement, notably:

A. The Medical Practice was in financial dire straits when Plaintiff discussed purchasing the company.

B. The Medical Practice was suffering problems regarding medical billing because the staff were improperly inputting billing codes.

C. Dr. Holmes was failing to come to the office to see scheduled patients.

D. The staff were functionally unable to perform their jobs properly.

E. The Medical Practice was losing patients.

F. The Medical Practice had failed to keep in stock and available legally required medicines, such as epinephrine.

G. The Medical Practice was failing to collect legally required medical co-pays.

14. Plaintiff outlined a plan to remedy the functional deficiencies from which The Medical Practice was suffering (enumerated in Paragraph 13).

15. In reliance on The Medical Practice, The Holmes, and The Agreement, the Plaintiff began to incur thousands of dollars in costs and time most of which will have to be deduced from Defendants' books and records in discovery.

16. After agreeing to the terms of The Agreement, and acting in reliance on such, Plaintiff began to take over all managerial, ministerial, administrative duties of The Medical Practice, and had office manager, Bert Underwood, overseeing all of these activities on a daily basis, including, but not limited to:

A. Hiring a medical billing consultant, David Cooper, at Plaintiff's sole expense. Mr. Cooper installed new and improved medical billing software and assisted in correcting medical billing code errors made by Mrs. Holmes and the staff of The Medical Practice.

4

B. Obtained a medical device known as ANS from Dr. Tom Mendolia, which added an extremely valuable service for the patients and greatly increased billing for the practice. The ANS device was obtained under an agreement in which Dr. Mendolia would receive thirty percent (30%) of insurance payments collected from insurance companies for all patient visits in which the ANS device was used.

C. At its sole expense, paid for new medical billing software (Elation) and software for dispensing medication out of The Medical Practice (Flexscan).

D. At its sole expense, hired a crew to clean and remodel the medical office with new paint, new wood walls, furniture and structural modifications that provided a sanitary environment and enhanced the esthetics of the office as well as the function of a medical practice.[1]

E. Interviewed, hired and paid a nurse practitioner, Kelley Coffey, to meet the needs of patients that were being neglected because of Dr. Holmes failure to see patients as needed.

F. Also interviewed, hired and paid a nurse practitioner, Cydney Vanosdale, to assist in correcting the failure of Dr. Holmes to see patients as needed.

G. Saw to it that the staff of the medical office were trained on the new billing software.

H. Negotiated and reduced the rent, as a result of the improvements made to the leasehold, with the landlord, Dr. Sanabria. Also, as the previous rental agreement between Dr. Sanabria and The Medical Practice had expired, and in order to keep

---

[1] The Medical Practice office was extremely dirty, unsightly and had a mold problem. Urine and blood were spattered on walls and floors throughout the office. Upon Plaintiff's discovery of the unsanitary conditions of the office, Plaintiff at its expense immediately remediated the mold for the safety of the patients and anyone working in the office.

5

the Practice located at 460 Medical Park Drive and paid the rent as it came due. Unbeknownst to the Plaintiff, but well known to Dr. Sanabria who did not advise Plaintiff until mid-August 2019 by way of an e-mail, The Medical Practice and Holmes were unable to continue with a new lease at Dr. Sanabria's lease location without financial backing. It is for this reason that Dr. Sanabria is also sued as a conspirator for fraud in the inducement herein. See Exhibit C.

I. Purchased two (2) new medical laptops and two (2) HD televisions for the waiting area.

J. Paid for marketing The Medical Practice through, among other methods, social media, mailings, and informational brochures which resulted in new patients for the Practice as well as the wellness and weight-loss side of the Practice. This marketing proved successful in greatly increasing revenues and profits by, but not limited to, attracting new patients.

K. Paid for and obtained the business license for The Medical Practice which Dr. Holmes had not done, and which is required by law.

L. Drafted numerous medical protocols for The Practice, employee handbooks, etc. which did not exist prior to Plaintiff taking over.

M. In sum and based on false statements of fact by Defendants, and upon information and belief, Plaintiff paid out of its own money in excess of more than $30,000 to the Defendants.

N. All monies paid by the Plaintiff were in reasonable reliance on the false promises of the Defendants based on numerous emails and texts messages confirming The Agreement. See Exhibits B, C, D.

17. On May 14 and 15, 2019, Rose texted Mrs. Holmes pictures of the office after the cleaning and remodeling was completed. Mrs. Holmes responded to express her pleasure with Rose's performance of Plaintiff's responsibilities under The Agreement. See Exhibit D.

18. As further evidence of the course of conduct evidencing the parties' consent to The Agreement, Plaintiff, in its role as manager, discovered that The Medical Practice was not collecting required co-pays, which Plaintiff immediately corrected. This is of material importance because the Defendants had been operating The Medical Practice in violation of federal law.

19. As a direct result of Plaintiff's involvement and management, The Medical Practice increased its billings from approximately $15,000 per month, prior to May 2019, to approximately $50,000 during the month of May 2019. Upon information and belief, Defendants are continuing to make $50,000 per month or more based solely on the investment, involvement and the management by Plaintiff for the Defendant.

20. All profits as a result therefrom are wrongfully and illegally required funds, requiring this Court to establish a constructive trust to obtain control over these funds as they are the rightful property of the Plaintiff.

21. As further evidence of the assent to The Agreement by both parties, a new account was opened at Oak Ridge National Laboratory Federal Credit Union ("ORNL") in Lenoir City, Tennessee (herein referred as "the New Account") naming Rose, as an authorized user along with Mrs. Holmes and The Medical Practice.

22. Rose was named on the New Account so that funds could be transferred from the New Account to the Plaintiff's account under the terms of Exhibit A.

23. Because insurance payments from Medicare, Cigna, United Health Care, and Caritan had been being automatically deposited into the United Community Bank Account the Defendants business account prior to the Agreement, and there was a time period beginning May 1, 2019 while the automatic deposits were transitioned over to the New Account, Mrs. Holmes was to pay all insurance proceeds collected from patients seen during the transition period into the New Account.

24. These funds were to be paid out according to the terms of Exhibit A.

25. Mrs. Holmes did start writing checks to the ORNL Account for insurance proceeds collected during the transition period. See Exhibit E.

26. Plaintiff opened a second medical office in Pigeon Forge, Tennessee, of which Dr. Holmes was to be the medical director again under the terms of Exhibit A.

27. As a result of the Plaintiff's purchase of the new medical billing software, equipment and its management, Defendants billed insurance companies a total of approximately $119,231.36 during the time period in which The Medical Practice was active under the terms of The Agreement -- May 1, 2019 until on or about August 5, 2019. This amount was a massive increase from the Defendants prior insurance billing. For purposes of clarification this was not the only sum of money generated as income for The Medical Practice.

28. On July 22, 2019, Mrs. Holmes texted Rose acknowledging the existence of The Agreement and its reduction to writing. In that message, Melissa Holmes referred to specific terms of The Agreement. See Exhibit F.

29. Throughout the time that The Agreement was active, Mrs. Holmes continually sent messages to Rose encouraging Rose to continue to perform Plaintiff's duties as

specified in The Agreement, although The Holmes had not been performing as agreed and, upon information and belief, had no intention to perform either personally or on behalf of The Medical Practice. <u>See</u> <u>Exhibit F</u>.

30. That on or about *August 5, 2019*, Rose discovered that she could no longer sign into the mobile banking account at ORNL. Ms. Rose contacted ORNL by phone and discovered that she had been removed from the account by either Dr. Holmes or Mrs. Holmes.

31. On August 5, 2019, upon discovering that she had been removed from the ORNL bank account, Rose texted Mrs. Holmes and inquired as to why she was removed from the bank account. Mrs. Holmes stated that Dr. Holmes was making changes. Mrs. Holmes, attempting to prevent Rose from accessing financial records, falsely claimed that the police had directed her not to discuss the issues presented by Rose. <u>See</u> <u>Exhibit B</u>.

32. Plaintiff also discovered upon information and belief that Mrs. Holmes, or someone acting on her direction, was blocking the input of the Explanations of Benefits (hereafter referred as "EOB") into the billing software Plaintiff had implemented to help The Medical Practice. This act by Mrs. Holmes enabled her to hide the true amount of money The Medical Practice was making at the expense and detriment of the Plaintiff.

33. Plaintiff discovered that The Holmes have used to their benefit one hundred percent (100%) of all billings and collections and capital injections from the Plaintiff during the time period covered by The Agreement.

34. Plaintiff discovered that The Medical Practice and/or The Holmes have taken for their benefit all patients brought in during the time period covered by The Agreement.

9

35. Plaintiff discovered, upon information and belief, that The Medical Practice and/or The Holmes failed to pay any of the money due to Dr. Mendolia for the use of the ANS device.

36. That after discovering that The Holmes were taking these deceptive and nefarious actions, Ms. Rose began removing the property the Plaintiff had paid for at 460 Medical Park Drive location on August 6, 2019. The Holmes, wanting to keep property for which they had paid nothing, called the sheriff to the office asking him to stop the movers from removing the personal property of the Plaintiff. The Sheriff declined this request and allowed the property to be removed and even advised the Plaintiff's agent that if they needed him to come back a second time to remove further personal property to call his personal cell phone.

37. On that same date above a second trip was required to remove Plaintiff's remaining property from the Medical Office, including two (2) HD televisions, and Plaintiff discovered that either Dr. Holmes or Melissa Holmes or someone at their direction had changed the locks to the office in an effort to prevent Plaintiff from obtaining the rest of its personal property.

38. The next day Plaintiff called Dr. Sanabria the landlord of 460 Medical Park Drive and advised him that Plaintiff had been locked out of the office. New keys were made to allow the Plaintiff back in the office, and a key was also made for the Defendants, and Defendants were advised of same by Rose via text message to Melissa Holmes.

39. On Wednesday, August 14, 2019, Plaintiff became aware that The Medical Practice and/or The Holmes abandoned the office at 460 Medical Park Drive resulting in the landlord trying to hold the Plaintiff's owners, Russ Egli, Wendy Rose and Bert

10

Underwood responsible for all rent owing under the lease. Upon information and belief, The Medical Practice is nothing more than an *alter ego* of The Holmes to pay their personal debts, and to that extent, including the fraud they committed, The Holmes, both jointly and severally, should be held personally liable for any judgment entered herein. Despite requesting the return of its personal property located at 460 Medical Park Drive, Dr, Sanabria has refused to return same.

40. The Holmes abandoned The Medical Practice and took all the knowledge and intellectual property of Plaintiff and went to the medical offices of Dr. Pete Stimpson in Loudon County, Tennessee where they are upon information and belief still operating The Medical Practice.

41. Based on Defendants fraud, Plaintiff is entitled to an award of punitive damages.

## COUNT I – FRUADULENT INDUCMENT OF CONTRACT

42. Plaintiff restates paragraphs 1-41 in support of Count I.

43. On multiple occasions, the Holmes stated to Plaintiff that they agreed with the terms of the purchase of The Medical Practice, which resulted in the Plaintiff paying thousands of dollars of its own money for the improvement of The Medical Practice including the payment of any outstanding debts, ongoing expenses in order to increase revenue pursuant to the terms of The Agreement.

44. Based on the foregoing the Defendants promises to complete the written Agreement were a lie and an intentional misrepresentation made for the express purpose to induce the Plaintiff to invest in and turn the profitability of The Medical Practice around. Quite obviously, the Defendants never intended to sign the Agreement; neither did they

11

intend to in any way compensate Plaintiff for its services or investment based on Plaintiff's reasonable reliance on Defendants promise to enter into The Agreement.

45. By telling the Plaintiff on various occasions they intended to sell The Medical Practice, The Holmes intended to have the Plaintiff rely on their knowingly false statements, and Plaintiff in fact did rely on these fraudulent statements. Plaintiff's reliance was in all material respects reasonably given the continued promises and assurances by The Medical Practice by way of the Defendant, Mrs. Holmes.

46. Plaintiff reliance on Defendants lies and misrepresentations was reasonable given that they were made by Defendant Mrs. Holmes on behalf of and in furtherance of The Medical Practice. Further, as previously set forth herein, Defendant, Dr. Holmes, the sole member of The Medical Practice cloaked his wife, Mrs. Holmes, with apparent authority regarding all non-medical decision aspects of The Agreement.

47. As a direct result of these Defendant's fraud, Plaintiff has suffered tens of thousands of dollars in damages in an amount to be proven at trial.

48. In addition, as a direct result of these Defendants fraud, and upon information and belief, the Defendants have used the money, intellectual property, management services, and billing software all belonging to the Plaintiff and as a result have made substantial profits which they otherwise would not have made.

49. Moreover, and upon information and belief, Dr. Sanabria joined in on the fraudulent conduct with The Medical Practice and The Holmes when he induced and received the benefit of the financial backing of Plaintiff to assist The Medical Practice in the Holmes to continue doing business at 460 Medical Park Drive when he knew that The Medical Practice and The Holmes never intended to continue paying rent at 460 Medical Park

12

Case 3:20-cv-00335-CLC-HBG   Document 1   Filed 08/02/20   Page 12 of 16   PageID #: 12

intend to in any way compensate Plaintiff for its services or investment based on Plaintiff's reasonable reliance on Defendants promise to enter into The Agreement.

45. By telling the Plaintiff on various occasions they intended to sell The Medical Practice, The Holmes intended to have the Plaintiff rely on their knowingly false statements, and Plaintiff in fact did rely on these fraudulent statements. Plaintiff's reliance was in all material respects reasonably given the continued promises and assurances by The Medical Practice by way of the Defendant, Mrs. Holmes.

46. Plaintiff reliance on Defendants lies and misrepresentations was reasonable given that they were made by Defendant Mrs. Holmes on behalf of and in furtherance of The Medical Practice. Further, as previously set forth herein, Defendant, Dr. Holmes, the sole member of The Medical Practice cloaked his wife, Mrs. Holmes, with apparent authority regarding all non-medical decision aspects of The Agreement.

47. As a direct result of these Defendant's fraud, Plaintiff has suffered tens of thousands of dollars in damages in an amount to be proven at trial.

48. In addition, as a direct result of these Defendants fraud, and upon information and belief, the Defendants have used the money, intellectual property, management services, and billing software all belonging to the Plaintiff and as a result have made substantial profits which they otherwise would not have made.

49. Moreover, and upon information and belief, Dr. Sanabria joined in on the fraudulent conduct with The Medical Practice and The Holmes when he induced and received the benefit of the financial backing of Plaintiff to assist The Medical Practice in the Holmes to continue doing business at 460 Medical Park Drive when he knew that The Medical Practice and The Holmes never intended to continue paying rent at 460 Medical Park

Drive. As a result of Dr. Sanabria's fraud he made handsome financial gains from the Plaintiff on the renovation of his leasehold, rents and personal property of the Plaintiff which he has refused to return. The fact that Dr. Sanabria knew that The Medical Practice and the Holmes intended not to pay rent going forward has significantly damaged the Plaintiff.

## COUNT II – UNJUST ENRICHMENT

50. Plaintiff restates paragraphs 1-41 in support of Count II.

51. Plaintiff, through its know-how and money, conferred numerous benefits upon The Medical Practice and/or The Holmes.

52. As a result of the benefits conferred upon The Medical Practice and/or The Holmes these Defendants accepted said benefits and used them to their financial benefit to the extent that it would be inequitable for these Defendants to retain such benefits without payment to the Plaintiff of the value thereof.

53. The payments made that benefited The Medical Clinic and/or The Holmes was unjust and has caused the Plaintiff tens of thousands of dollars in damages.

54. Plaintiff is entitled to all monies it expended which unjustly enriched the Defendant.

## COUNT III – DETRIMENTAL RELIANCE

55. Plaintiffs restate paragraphs 1-41 in support of Count III.

56. Defendants and more specifically The Medical Practice through Dr. Holmes and Melissa Homes promised to sell the medical business to the Plaintiff.

57. Plaintiff relied on the promises made by The Medical Practice through Dr. Holmes and Melissa Holmes and said reliance was reasonable based on their representations made to Plaintiff set forth herein.

58. Plaintiff acted on the promise made by The Medical Practice through Dr. Holmes and Melissa Holmes by spending thousands of dollars of its own money and time.

59. Plaintiff's reliance on The Medical Practice through Dr. Holmes and Melissa Holmes was detrimental to Plaintiff.

60. The injustice perpetrated on the Plaintiff can only be justified by enforcing the promise.

61. Plaintiff is entitled to all monies it expended which unjustly enriched the Defendant.

### COUNT IV – CONSTRUCTIVE TRUST

62. Plaintiff restates Paragraphs 1-41 in support of Count IV.

63. Based upon Defendants' fraud, and upon Plaintiff's reasonable reliance thereof, these Defendants have realized substantial profits based solely upon their fraud which they are not entitled.

64. Plaintiff would request this Court to establish a constructive trust for all profits realized by the Defendants fraud as noted herein. As Plaintiff is unaware of the exact amount of profits realized by the Defendants as a result of their fraud, Plaintiff would seek leave to amend its complaint in order to specify this amount after discovery.

### COUNT V – CONVERSION

65. Plaintiff restates Paragraphs 1-41 in support of Count V.

66. Plaintiff purchased two large flat screed TVs for the leasehold located at 460 Medical Park Drive.

67. When the Defendants, The Medical Practice and Holmes, abandoned the leasehold Plaintiff demanded return for the TVs from Dr. Sanabria.

68. Dr. Sanabria has refused to return the TVs to the Plaintiff.

69. Dr. Sanabria's conversion of the Plaintiff's personal property has caused it damages.

## COUNT VI – CONSPIRACY TO COMMIT FRAUD

70. Plaintiff restates Paragraphs 1-41 in support of Count VI.

71. Upon information and belief prior to benefitting from the renovation of his leasehold at 460 Medical Park Drive and benefitting from same, Dr. Sanabria knew that both The Medical Practice and The Holmes would not pay rent. See Exhibit C.

72. Despite having knowledge of The Medical Practice and Holmes intentions of not paying rent he failed to make the Plaintiff aware of same and instead encouraged the Plaintiff to make renovate the leasehold at its sole expense thereby benefitting Dr. Sanabria's property to the detriment of the Plaintiff.

73. As a result of Dr. Sanabria's conspiracy to commit fraud with The Medical Practice and The Holmes Plaintiff has been damaged and Dr. Sanabria should be held jointly and severally liable in conspiring to commit fraud with the Co-Defendants herein.

WHEREFORE, PLAINTIFF PRAYS FOR JUDGMENT AS FOLLOWS:

A.  That this complaint be filed and served upon the Defendants herein requiring their response within the time required by law.

B.  For judgment against Defendants, jointly and severally, in the amount of $1,000,000 for actual damages including the amount expended by Plaintiff as set forth herein and the amount yet unknown of the increase in profit based upon the Defendants' use of the Plaintiff's resources as set forth herein.

C.  For a jury to be impaneled to try this cause.

D.  For an award of punitive damages against all Defendants.

F.  For all costs and expenses to be taxed to the Defendants.

G. For an issuance of a constructive trust over The Medical Practice for the benefit of Plaintiff.

H. For general relief.

Respectfully submitted,

s/Darren V. Berg
Darren V. Berg
Lead Counsel for the Plaintiff
LAW OFFICES OF DARREN V. BERG
P.O. Box 33113
Knoxville, TN 37930
(865) 773-8799
E-mail: berg1222@hotmail.com

s/Russell Egli
Russell Egli
Co-Counsel for the Plaintiff
THE EGLI LAW FIRM
The Wisdom Building
11109 Lake Ridge Drive, FL3
Concord, TN 37934
(865) 304-4125
E-mail: russelleglilaw@gmail.com